UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

       Plaintiff,

    vs.                REPORT AND RECOMMENDATION

Ramon Arceo-Arteaga

       Defendant.         Crim. No. 05-339 (PAM/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Defendant's Motion to Suppress Evidence.  A Hearing on the Motion was conducted on November 7, 2005, at which time, the Defendant appeared personally, and by William C. Orth, Esq., and the Government appeared by Nathan P. Petterson, Assistant United States Attorney.

For reasons which follow, we recommend that the Defendant's Motion to Suppress be denied.[1]

―――――――――――――

      [1]The parties have submitted briefing on the issues raised by the Defendant's
(continued...)

II. Factual Background

The Defendant is charged with one Count of Illegal Re-Entry After Deportation, in violation of Title 8 U.S.C. §§ 1326(a) and (b)(2), and Title 6 U.S.C. §§202 and 557. The events which give rise to those charges are said to have occurred on or about September 12, 2005, in this State and District.  As pertinent to the charges, and to the Motion now before us, the operative facts may be briefly summarized.[2]

At the Hearing on the Defendant's Motion, Herbert J. Fineday ("Fineday"), whois a former Sergeant with the Fond Du Lac Indian Reservation Tribal Police Department, testified at the instance of the Government,[3] while Melissa Greensky

─────────────────────────

[1](...continued)
Motion, and the last brief on those issues was received on November 15, 2005, at which time, the Motions were taken under advisement.  See, Title 18 U.S.C. §3161(h)(1)(F) and (J); Henderson v. United States, 476 U.S. 321, 330-32 (1986); United States v. Blankenship, 67 F.3d 673, 767-77 (8th Cir. 1995).

[2]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record."  As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion.  Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts and law may require.  See, United States v. Moore, 936 F.2d 287, 288-89 (6th Cir. 1991); United States v. Prieto-Villa, 910 F.2d 601, 610 (9th Cir. 1990).

[3]Apparently Fineday was subpoenaed by the Defendant, but he testified at the
(continued...)

- 2 -

("Greensky"), who is a resident of the Fond Du Lac Reservation, testified at the instance of the Defendant.

On September 12, 2005, Fineday was patrolling the area along Moorhead Road, near Churchhill Road, when he was flagged down by three individuals who were walking alongside of the road.  One of the individuals, who Fineday identified as Garrett Defoe ("Defoe"), advised Fineday that there was an unknown man, who was driving a blue car with Missouri license plates, located in a section of woods that was on the property of Jeff Northrup ("Northrup"), and that he had been there for approximately one (1) hour.[4]  Northrup was one of the three individuals who had stopped Fineday, and Fineday testified that he was under the impression that Defoe was speaking on behalf of Northrup.

---

[3](...continued)
instance of the Government.  It was established at the Hearing, that Fineday was terminated from his employment with the Fond Du Lac Police Department sometime in September of 2005, approximately two (2) to three (3) weeks after the events which are at issue in the Defendant's Motion.  By every appearance, his employment termination was unrelated to the Defendant.

[4]More specifically, Fineday's testimony reflected that the property is owned by the Fond Du Lac Reservation, and that Northrup rents the property from the Reservation.

After receiving this information, Fineday proceeded towards Northrup's residence, in order to investigate a possible trespass. While traveling down Churchill Road, Fineday observed a blue Monte Carlo, with Missouri license plates, that was parked in the driveway of the residence, which belonged to Greensky, and which apparently adjoins Northrup's property from the back. Fineday drove to the end of the road, turned around, and then proceeded back to Greensky's residence. Fineday pulled his vehicle into the driveway, behind the Monte Carlo,[5] and called his dispatcher, in order to run a check on the license plates on the Monte Carlo. The license check revealed that the vehicle was registered to an individual from Missouri.

While he was checking the license plates on the Monte Carlo, Fineday observed the Defendant walk from around the back side of Greensky's house. Fineday announced his presence and identified himself as a police officer. He then approached the Defendant and asked him about the purpose of his presence at the Greensky residence. The Defendant informed Fineday that he was there to see someone named "Boogit." Fineday did not recognize that name, and asked the Defendant for some

---

[5]It is unclear, based on the Record before us, whether Fineday's squad car was positioned in such a manner that the Defendant would not have been able to exit Greensky's driveway.

form of identification.   The Defendant provided Fineday with a Mexican driver's license, but he was unable to produce a passport, resident alien card, visitor's visa, or any other form of identification.   Fineday testified that a Mexican driver's license does not authorize an individual to drive in the United States.   Also, the name on the Defendant's license did not match the person to whom the Monte Carlo was registered and, upon Fineday's inquiry, the Defendant advised that the vehicle belonged to "a friend."   Following this inquiry, Fineday had the Defendant sit in the back of his squad car, but he did not place handcuffs on him, or restrain him in any other way.

According to Fineday, communication between he and the Defendant was difficult because he did not speak Spanish, and the Defendant did not speak English. As such, Fineday contacted his dispatcher, and obtained the telephone number of the United States Border Patrol.   Fineday then contacted a Border Patrol Agent, and provided the Agent with a brief description of the circumstances.   The Agent and the Defendant then communicated, in Spanish, over Fineday's cellular telephone.   At the conclusion of their discussion, the Agent advised Fineday that he did not intend to take any action with respect to the Defendant, but that Fineday could arrest the Defendant on a local charge, if such an arrest would be warranted.   Fineday testified

that he and the Border Patrol Agent did not discuss whether the Defendant was present in the United States legally.

After his discussion with the Border Patrol Agent, Fineday again contacted his dispatcher, in order to run a check of the Defendant's name through the National Crime Information Center ("NCIC") database.  The check revealed that the Defendant had previously been convicted of a serious felony, and had been deported from the United States, after that conviction.  Fineday proceeded to contact the NCIC Law Enforcement Support Center, so as to determine the status of the Defendant's deportation, as well as his previous felony conviction, and to determine whether the Defendant needed to be taken into custody.   An Agent from the NCIC Law Enforcement Support Center  provided Fineday with a physical description of the individual that the Agent believed to be Ramon Arceo-Arteaga, which matched the description of the Defendant, except that the Agent from the NCIC identified the Defendant as white.  The Agent also advised Fineday that the Defendant had a tattoo on his chest.  Fineday asked the Defendant to lift up his shirt, at which time, he observed a tattoo near the Defendant's collar bone.

After identifying the Defendant, the Agent instructed Fineday to arrest the Defendant, and to bring him to a local Jail.  Fineday was also instructed that a hold

would be placed on the Defendant. Fineday followed the Agent's direction, and placed the Defendant under arrest. He then brought the Defendant to the Carlton County Jail, where a hold was placed on him, and he was eventually turned over to the custody of the United States Department of Homeland Security, Office of Immigration and Customs Enforcement.

At the time that Fineday was questioning the Defendant, Greensky was present in her home. Fineday had no interaction with Greensky, although the Record reflects that Greensky did speak to Jason O'Leary ("O'Leary"), who is also a Fond Du Lac police officer, and who arrived sometime during the questioning, in order to assist Fineday. Greensky testified that an individual named "Boogit" occasionally stayed at her home, and that she told O'Leary that she had seen the Defendant on at least one other occasion, and that she recognized his vehicle. However, she also testified that, at the time of her conversation with O'Leary, she did not know the Defendant's name,[6] that he was not at her house to see her, and that she did not know anything about the Defendant, except that she recognized him.[7]

---

[6]Apparently, Greensky learned the Defendant's name from her conversations with an investigator for the Defendant.

[7]Greensky testified that one possible reason, why her recollection of the
(continued...)

### III.  Discussion

A.  <u>Standard of Review</u>.   The Fourth Amendment provides that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." <u>United States Constitution, Amendment IV</u>.  A roadside traffic stop "is well established" as a "'seizure' within the meaning of the Fourth Amendment." <u>United States v. Jones</u>, 269 F.3d 919, 924 (8th Cir. 2001), quoting <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979); see also, <u>United States v. Martinez-Fuerte</u>, 428 U.S. 543, 556-558 (1976); <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 878 (1975).   An essential purpose behind the Fourth Amendment's proscriptions is to impose standards of reasonableness upon the exercise of law enforcement's discretionary powers, so as to safeguard an individual's privacy from arbitrary invasion by the Government.  See, <u>Delaware v. Prouse</u>, supra at 653-54; <u>Marshall v. Barlow's Inc.</u>, 436 U.S. 307, 312 (1978); <u>Camara v. Municipal Court</u>, 387 U.S. 523, 528 (1967).  Thus, whether a certain action is permissible, under the Fourth Amendment, "is judged by balancing [that action's] intrusion on the

---

[7](...continued)
Defendant was so limited, was that she had been using alcohol on a frequent basis during the months prior to the Defendants' arrest.

individual's Fourth Amendment interests against its promotion of legitimate governmental interests." <u>Id.</u> at 654.

In considering the extent to which a traffic stop intrudes upon an individual's Fourth Amendment interests, the Supreme Court has held that traffic stops are investigative detentions, not custodial detentions, and therefore, the principles of <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), govern the analysis of the reasonableness of the stop. <u>United States v. Jones</u>, supra at 925, citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439 (1984); see also, <u>Delaware v. Prouse</u>, supra at 663.   As a consequence, the Supreme Court has instructed that, prior to making a traffic stop, a law enforcement officer must have "probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations -- or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered." <u>Delaware v. Prouse</u>, at 661.

However, "consensual encounters between police officers and private citizens do not invoke Fourth Amendment protections."  <u>United States v. Rayos-Parra</u>, 312 F.3d 343, 346 (8th Cir. 2002), citing <u>Florida v. Bostick</u>, 501 U.S. 429, 434-35 (1991). As our Court of Appeals has recently explained:

> Not every encounter between a police officer and a citizen
> constitutes an unreasonable seizure under the Fourth

Amendment:  "Obviously, not all personal intercourse between policemen and citizens involves 'seizures' of persons.  Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred."  Terry [v. Ohio], 392 U.S. [1,] 19 n. 16, [(1968)]; see also United States v. Mendenhall, 446 U.S. 544, 553-54 (1980)("Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards.  The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but 'to prevent arbitrary and oppressive interference by enforcement officials with privacy and personal security of individuals.'")(quoting United States v. Martinez-Fuerte, 428 U.S. 543, 554 (1976)).  The Supreme Court has made it abundantly clear "that mere police questioning does not constitute a seizure."  Florida v. Bostick, 501 U.S. 429, 434 (1991).  For example, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions."  Id. (quoting Florida v. Royer, 460 U.S. 491, 497(1983) (plurality opinion)).

United States v. Barry, 394 F.3d 1070, 1074 (8th Cir. 2005); see also, United States v. Ortiz-Monroy, 332 F.3d 525, 528 (8th Cir. 2003)(consensual encounter occurred when an officer approached a parked car in a rest area, late at night, and asked questions about the driver's identity).

"Some circumstances that inform the determination of whether a seizure took place include:  officers positioning themselves in a way that limits the person's freedom of movement, * * * the presence of several officers, the display of weapons by officers,

physical touching, the use of language or intonation indicating compliance is necessary, the officer's retention of the person's property, or an officer's indication that the person is the focus of a particular investigation. United States v. Johnson, 326 F.3d 1018, 1021-22 (8th Cir.2003), cert. denied, 540 U.S. 962 (2003), citing Ninety One Thousand Nine Hundred Sixty Dollars, 897 F.2d 1457, 1461 (8th Cir. 1990), United States v. Campbell, 843 F.2d 1089, 1093 (8th Cir. 1988), United States v. Nunley, 873 F.2d 182, 185 (8th Cir. 1989), and Florida v. Royer, 460 U.S. 491, 503, n. 9 (1983).

2.   Legal Analysis.   Here, the Defendant has challenged his initial investigatory detention, as being unsupported by a reasonable articulable suspicion and, specifically, that the information provided by the three individuals, who Fineday encountered on Moorhead Road, as well as Fineday's own personal observations, were insufficient to create a reasonable suspicion to suspect that the Defendant had committed a trespass under Minnesota law.[8]   In furtherance of his argument, the

---

[8]As is pertinent to our analysis, a trespass, under Minnesota law, includes the presence of a person "on the property of another and, without a claim of right, refuses to depart from the premises on demand of the lawful possessor." Minnesota Stutes, Section 609.605, Subdivision 1(b)(3). Fineday's testimony also reflects  that the Fond Du Lac Tribal code prohibits trespass, although he could not identify the precise code provision which contained such a prohibition.

Defendant contends that he was seized at the time that Fineday pulled his vehicle into the driveway of the Greensky residence, and ran a check on the license plate of the Monte Carlo.  In contrast, the Government maintains that Fineday did not seize the Defendant until after he had learned that the Defendant did not have a license, which authorized him to drive in the United States, or any other documents to show that his presence in the United States was lawful.

As an initial matter, the Defendant has relied heavily on Fineday's testimony that, following his conversation with the three individuals on Moorhead Road, he intended to stop the Defendant on the suspicion of trespassing.  However, in determining whether Fineday's conduct was permissible under the Fourth Amendment, his subjective intent is irrelevant.  See, McClendon v. Story County Sheriff's Office, 403 F.3d 510, 515 (8th Cir. 2005)("[A]n officer's subjective intent is never relevant under a Fourth Amendment analysis, so long as a subjective basis for the seizure exists."), citing Saucier v. Katz, 533 U.S. 194, 210 (2001)(Ginsberg, J. concurring); United States v. Pereira-Munoz, 59 F.3d 788, 791 (8th Cir. 1995); United States v. Bloomfield, 40 F.3d 910, 916 (8th Cir. 1994), cert. denied, 514 U.S. 1113 (1995); United States v. Archer, 840 F.2d 567, 572 (8th Cir. 1988).  Accordingly, we limit our analysis to the objective circumstances, which surrounded the interaction

between Fineday and the Defendant, in determining the point at which the Defendant was seized for the purposes of a Fourth Amendment inquiry.

Having considered the Record as a whole, we find that the initial encounter, between Fineday and the Defendant, did not give rise to an investigatory seizure, but was merely a consensual encounter.  Notably, at the time that Fineday parked his squad car behind the Defendant's vehicle, and ran a check on the Defendant's license plates, the Defendant was somewhere behind Greensky's house, and was likely unaware of Fineday's presence.  Moreover, even assuming that the Defendant was aware of Fineday's presence, the Record is clear that, at that time, Fineday had  not made any show of authority, much less one that would warrant a reasonable person in the Defendant's position to believe that he was not free to terminate the encounter.

Further, even after Fineday observed the Defendant walk from the rear of Greensky's house, the Defendant has made no showing that Fineday brandished his firearm, or that he directed the Defendant's movements, or otherwise engaged in any conduct that would objectively demonstrate to the Defendant that compliance with Fineday's requests was mandatory.  Instead, the Record reflects that Fineday approached the Defendant, announced himself as a police officer, and began an inquiry concerning the Defendant's identity, and his presence on the property, which

- 13 -

Fineday knew to belong to Greensky.   The Defendant voluntarily responded to Fineday's questions, and provided Fineday with the only form of identification that he had, which was a Mexican driver's license.   Under these circumstances, we find that the initial interaction between Fineday, and the Defendant, was a consensual encounter, and therefore, did not fall within the ambit of the Fourth Amendment.  See, United States v. Barry, supra at 1076 (recognizing that the Fourth Amendment permits an officer to approach a parked vehicle); United States v. Gipp, 147 F.3d 680, 685 (8th Cir. 1998); United States v. Baker, 290 F.3d 1276, 1279 (11th Cir. 2002), cited favorably in United States v. Barry, supra at 1076; see also, United States v. Jefferson, 906 F.2d 346, 349 (8th Cir. 1990)(recognizing that a seizure is not effected merely by approaching an individual that is seated inside of a parked vehicle);[9] I.N.S. v. Delgado, 466 U.S. 210, 219-20 (1984)(Agents from the Immigration and

---

[9]While the Court in United States v. Jefferson, 906 F.3d 346, 349 (8th Cir. 1990), found that the act of approaching a parked vehicle did not constitute a seizure, it ultimately concluded that the actions of the officer, in retaining the identification cards of the two individuals who were in the car, in asking both individuals to exit the vehicle, and in sitting next to the driver of the vehicle, in the front seat of his squad car, "transformed what may have been a consensual exchange into a situation in which 'a reasonable person would have believed that he was not free to leave.'" Consistent with the Court's holding in Jefferson, our analysis reflects that the encounter between Fineday and the Defendant lost its consensual character when the Defendant was instructed to sit in the back seat of the officer's squad car.

Naturalization Service did not seize individuals, when they posted Agents at the doors to a factory, then entered the factory, and made inquiries into several of the factory workers' immigration status).

Fineday testified that the Defendant's Mexican drivers license did not authorize him to drive in the United States, and that the Defendant was unable to produce any documents which would establish his lawful presence in the United States, such as a passport, resident alien card, or visitor's visa.  Accordingly, Fineday was justified in detaining the Defendant at that time, by instructing him to sit in the backseat of his squad car, without handcuffs, or any other restraints,[10] as an objectively reasonable suspicion was presented to believe that the Defendant was not lawfully allowed to drive in this State, or to be present in this country.  See, United States v. Rivera-Ruiz, 2002 WL 992755 at *3 (D. Minn., May 14, 2002)(finding that an officer was presented with reasonable suspicion of an individual's alien status where the individual did not speak English and his only form of identification was a Mexican

---

[10]Under the law of this Circuit, we are satisfied that the degree of restraint imposed upon the Defendant, in being placed in the back of Fineday's squad car, without handcuffs, did not amount to a de facto arrest, as would have required Fineday to advise the Defendant of his constitutional rights under Miranda v. Arizona, 384 U.S. 436 (1966).  See, United States v. Johnson, 64 F.3d 1120, 1126 (8th Cir. 1995), cert. denied 516 F.3d 1139 (1996).

voter registration card).   On the basis of what Fineday then knew, he would have abdicated his responsibilities as a peace officer to allow one who, ostensibly, was not licensed to drive a motor vehicle to leave the scene without verification that the Defendant has such authorization.   As a result, Fineday was permitted to expeditiously investigate the Defendant's immigration status, which he did by first contacting a Border Patrol Agent, and then by running a check of the Defendant's name on the NCIC database.   Id.

In sum, we find no constitutional violation in the investigatory seizure of the Defendant, as the initial encounter between Fineday and the Defendant was consensual, and the ensuing investigatory seizure was supported by a reasonable articulable suspicion that the Defendant's presence in the United States was unlawful. Accordingly, since we find that Fineday's conduct did not violate the Defendant's rights under the Fourth Amendment, we recommend that his Motion to Suppress be denied.

NOW, THEREFORE, It is --

RECOMMENDED:

That the Defendant's Motion to Suppress [Docket No.14] be denied.

Dated: November 22, 2005              s/Raymond L. Erickson
                                      Raymond L. Erickson
                                      CHIEF U.S. MAGISTRATE JUDGE

## NOTICE

Pursuant to Rule 45(a), Federal Rules of Criminal Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than December 9, 2005**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections. Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing **by no later than December 9, 2005**, unless all interested

- 17 -

parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.